(Not for publication)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

|  |  |  |
|---|---|---|
| BESSIE M. TRADER, | : | |
| | : | |
| Plaintiff, | : | Civil No. 05-4065 (RBK) |
| | : | |
| v. | : | **OPINION** |
| | : | |
| STATE OF NEW JERSEY, DIVISION | : | |
| OF STATE POLICE, et al., | : | |
| | : | |
| Defendants. | : | |
| | : | |

**KUGLER**, United States District Judge:

This matter comes before the Court on a motion by Defendants SFC Dennis Tully,

Sergeant Raymond Jacobs, Trooper I Christopher Rocap, Trooper I John Parkinson, Trooper II

Jason Innella, Trooper II Eric Schmitt, Trooper II Christopher Demaise, Trooper II Sam

Cappuccio, William Weingartner (collectively "T.E.A.M.S. Officers"), Detective Ricardo Solis

("Detective Solis," collectively "Defendants") for summary judgment against Plaintiff Bessie M.

Trader on her claims brought pursuant to 42 U.S.C. § 1983. Trader accuses Defendants of

violating her Fourth and Fourteenth Amendment rights in connection with a search of her home.

For the reasons set forth below, the Court will grant Defendants' motion.

## I.    BACKGROUND

Trader has lived in her home at 628 York Street in Camden, New Jersey since 1958.

1

(Defs.' Br. Ex. F at 6.)  Over time, the drug trade took hold in her neighborhood, and it began to deteriorate.  At first, Trader took action, reporting crimes to police and the names of those involved; however, the police responded they already knew who was perpetrating crime in her neighborhood.  (Id. at 7-8.)  Now, she opposes the drug trade by asking the people involved with it to stay away from her house.  (Id. at 7.)  She has also complained to her son-in-law, who is a Camden police officer, that she feels not enough is being done to stop the drug trafficking.  (Id. at 95.)  To protect herself and her property, she posted a "no trespassing" sign on her property, and she has deadbolt locks on both her front and back doors, as well as locks on her windows.  (Id. at 11, 22.)  When she leaves her home, she routinely checks to ensure that her windows are closed and locked.  (Id. at 12.)  Only certain trusted family members have keys to her home.  During the summer of 2003, Trader was periodically out of town visiting family in Blackwood, New Jersey.  (Id. at 12.)

In early September 2003, Detective Solis acquired a tip from a confidential informant, who had provided him with reliable information in the past, that someone was selling heroin from 628 York Street, Trader's address, and from the house across the street, 629 York Street.  Detective Solis set up surveillance of these houses on September 11, 2003.  As a result of his observations, he prepared a twenty-five paragraph affidavit.  The first three paragraphs digest Detective Solis's extensive background in drug investigations.  This experience includes more than fifteen years working for the New Jersey State Police, participation in numerous undercover drug purchases in both New Jersey and Pennsylvania, and extensive schooling in law enforcement.  Because the Court must assess whether Detective Solis's affidavit provided a substantial basis for finding of probable cause, the Court recites the next portion verbatim:

2

4.      During the week of September 7th, 2003, I received CDS related information from a confidential informant hereinafter referred to as C/S.  The information that was relayed by C/S was first hand personal knowledge.  C/S has previously provided information to Law enforcement personnel in the past, which was corroborated, proven reliable, and has been useful in previous investigations.

5.      C/S stated that he/she knows of individuals who sell heroin from 628 and 629 York Street Camden, N.J. and has personally witnessed the CDS distribution activity.  C/S described the first subject as a Hispanic male, medium build, 5'-07" to 5'-10" tall, medium complexion, and approximately 20 to 30 years old, known to C/S as "Dirty Danny".  C/S added that he sells heroin every day from the residence.  C/S advised that "Dirty Danny" arrives at the residence on foot every morning, and that the heroin is sold from approximately 7:00 AM until approximately 11:00 PM from 628 York Street.  C/S added that "Dirty Danny" receives shipments of heroin from a heavy set Hispanic male.  C/S stated that the unknown Hispanic male drives a blue Chevrolet Suburban with chrome rims, and that he delivers the heroin to 628 York Street at intervals throughout the day.  C/S advised that "Dirty Danny" frequently gives US currency to the unknown Hispanic male in exchange for the shipments of heroin.

6.      C/S further advised that another Hispanic male works in conjunction with "Dirty Danny", and resides at 629 York Street.  C/S could not indentify this Hispanic male by name, however, described him as 5'-05" to 5'-09" tall, with very little hair, and a heavy build.  C/S advised that the heavy set Hispanic male sells heroin along with "Dirty Danny", and that the pair exchange heroin and US currency openly throughout the day.  C/S stated that the heroin is frequently sold from the front foyer and steps of 629, and that the heavy set Hispanic male keeps only a portion of the supply inside 629.  C/S stated that the main supply, or "Stash" is kept inside 628, and that when the heavy set male runs out of product, he or "Dirty Danny" walk across the street to 628 and obtain more product from the "Stash".  C/S further advised that often, the product (heroin), is stored at 628 York Street, and that the US currency is kept at 629 York Street.  C/S added information that he/she has seen both "Dirty Danny", and the heavy set Hispanic Male who resides at 629 York Street, receive heroin from the Hispanic Male in the blue Chevrolet Suburban, and has seen both subjects give US currency to the supplier.  C/S concluded by advising that heroin is sold from 629 York Street from approximately 7:00 AM until approximately 11:30 PM

7.      On September 11th 2003, at approximately 6:45 AM, surveillance was initiated in the area of 628 and 629 York Street, as a result of the information provided by C/S.  I remained in an undisclosed location, whereby I was able to view both residences without obstruction.  At approximately 7:25 AM, a Hispanic male wearing a blue sweat jacket with white stripes, blue jean shorts, and white

sneakers arrived at 628 York Street via 6th Street from State Street. He was observed to stand on the front porch of 628 York Street, and enter the residence briefly. A blue Chevrolet Suburban with chrome rims, bearing Pennsylvania Registration FJC9432 arrived, and parked directly in front of 628 York Street (A Pennsylvania Department of Motor Vehicle inquiry later revealed the tag to be not on file). The Hispanic male wearing the blue sweat jacket with white stripes exited the residence, and met with the driver of the Suburban. The driver of the Suburban was observed to be a middle aged Hispanic male, who remained inside the vehicle as he conversed with the Hispanic male wearing the blue sweat jacket with white stripes, who was standing adjacent to the driver's side window. The driver of the Suburban handed the other male a brown paper bag, which was immediately secreted inside the blue sweat jacket with white stripes. The Suburban was then observed to drive off toward 7th Street, as the male with the blue sweat jacket with white stripes walked inside the front door of 628 York Street. At approximately 0728 hours a white male wearing a blue sweat shirt, blue jeans, work boots, with blond hair walked onto the porch of 628 York Street, and engaged in a brief conversation with Hispanic male wearing a blue sweat suit jacket with white stripes, white tee-shirt, blue jean shorts, and white sneakers. The Hispanic male was then observed to enter the residence of 628 York Street through the front door and remain inside for approximately 20 seconds. The Hispanic male then exited the residence and approached the white male. The white male then handed the Hispanic male an amount of US Currency, in exchange for small items, which the white male secured in his right pants pocket. The white male, later identified as Francis Kehoe Jr., was then observed to enter a white Ford box truck, bearing NJ registration X7OV80, and depart West bound on York Street. Based on my training and experience, the observations of the aforementioned actions of the US Currency being exchanged for small items is consistent and indicative of a narcotics transaction. At this time I immediately contacted arrest team members via portable radio and provided a description and direction of travel of Kehoe and advised to stop the vehicle and arrest him, once he was out of the immediate area. Kehoe was followed by arrest team members, and was stopped at which time arrest team members observed two bags of suspected heroin in plain view on the front passenger's seat. Kehoe was placed under arrest, at which time he was handcuffed and searched. Search incidental to arrest revealed Kehoe to possess, two additional bags of suspected heroin in his right front pant pocket. The two bags of suspected heroin on the front passenger seat were stamped "THE POWER", and the two found in his pocket were stamped, "CHANY". All four bags contained a white powder (Heroin). Same evidence was later field tested utilizing the NIK Public Safety Inc. Marquis Reagent Test "A", as per the manufactures [sic] specifications. Same test resulted in a purple reaction, thus testing positive for the presence of Opium Alkaloids (Heroin).

4

8.      At approximately 0730 hours, I observed a black male wearing a red shirt, gray sweat shorts, and a black rag style hat, walk to the front of 628 York Street and engage in a brief conversation with the same Hispanic male wearing blue sweat suit jacket with white stripes.  The Hispanic male was then observed to walk up to the front of the residence (628 York Street) at which time he was observed to reach inside of the window located to the left of the front door.  The Hispanic male then returned to the black male and handed some small items in exchange for an amount of US Currency.  Upon receiving the small items from the Hispanic male, the black male was observed to examine the items, and then place the items into his right sock.  The black male was then observed to walk East bound on York Street and out of my sight.  Based on my training and experience, the observations of the aforementioned actions of the U.S. Currency being exchanged for small items is consistent and indicative of a narcotics transaction.

9.      At approximately 0735 hours, I observed a white male wearing a brown vest over a white tee-shirt, brown shorts, and brown work boots approach the Hispanic male wearing a blue sweat suit jacket with white stripes, in front of 628 York Street.  The Hispanic male was then observed to reach inside of a window located on the left side of the front door and retrieve item(s).  The Hispanic male immediately returned to where the white male was standing and handed him small items in exchange for U.S. Currency.  The white male secured the items in his right front pants pocket and departed the area Eastbound on York Street, out of my sight.  Based on my training and experience, the observations of the aforementioned actions of the US Currency being exchanged for small items is consistent and indicative of a narcotics transaction.

10.     At approximately 0736 a Hispanic male wearing a gray sweat shirt, long blue jeans was observed to walk up to an engage in a brief conversation with the Hispanic male on the front porch steps of 628 York Street.  The Hispanic male (blue sweat jacket with white stripes) was then observed to walk up the front steps and enter 628 York Street through the front door and remain inside for approximately 30 seconds.  The Hispanic male exited the front door of the residence and walked directly to the Hispanic male with the gray sweat shirt with his right hand clenched and extended in front of his body.  The Hispanic male with the gray sweat shirt then handed an amount of US Currency to the second Hispanic male (blue sweat jacket with white stripes) who was observed to drop small items from his clenched right hand.  The Hispanic male wearing the gray sweat shirt was observed to count the items as they were dropped into his hand by the second Hispanic male.  The Hispanic male with the gray sweat shirt then departed the area East bound [sic] on York Street and out of my view.  Based on my training and experience, the observations of the aforementioned actions of the US Currency being exchanged for small items is consistent and indicative of

narcotics transaction.

11.     At approximately 0737 hours, I observed a thin white male wearing a red shirt, and blue shorts, was observed to walk to the front of 628 York Street and engage in a brief conversation with the same Hispanic male wearing the blue sweat suit jacket with white stripes.  The Hispanic male was then observed to walk up to the residence (628 York Street) at which time he was observed to reach inside of the window located to the left of the front door.  The Hispanic male then returned to the white male and handed small items in exchange for an amount of US Currency.  Upon receiving the small items from the Hispanic male, the white male was observed to place the item into his left front pants pocket.  The white male was then observed look around in all directions in a nervous manner and then walk Eastbound on York Street and out of my sight.  Based on my training and experience, the observations of the aforementioned actions of the U.S. Currency being exchanged for small items is consistent and indicative of a narcotics transaction.

12.     At approximately 0740 hours, a Hispanic male wearing a black tee shirt, long blue pants was observed to walk up to an engaged in a brief conversation with the Hispanic male on the front porch steps of 628 York Street.  The Hispanic male (blue sweat jacket with white stripes) was then observed to walk up the front steps at which time he was observed to reach inside of the window located to the right of the front door.  The Hispanic male then returned to the Hispanic male wearing the black tee-shirt, who was observed to be counting US Currency.  The Hispanic male, wearing the black tee-shirt then handed an amount of US Currency to the second Hispanic male (blue sweat jacket with white stripes) in exchange for small items.  The Hispanic male wearing the black tee-shirt was observed to briefly examine the items and depart the area Westbound on York Street to 6th Street and out of my view.  Based on my training and experience, the observations of the aforementioned actions of the US Currency being exchanged for small items is consistent and indicative of a narcotics transaction.

13.     At approximately 0752 hours the Hispanic male wearing the blue sweat jacket with white stripes was observed to enter 628 York Street for approximately 30 seconds, at which time he walked across York Street and positioned himself in front of 629 York Street.  Approximately one minute later a heavy set Hispanic male wearing a white tee-shirt, blue short pants, and white sneakers exited 629 York Street and engaged in conversation with the Hispanic male wearing the blue sweat jacket with white stripes.  After a short period of time the Hispanic male wearing the blue sweat jacket with white stripes was observed to hand the heavy set Hispanic male two items.  The heavy set Hispanic male then secured the items in his right hand and walked directly inside of 629 York Street.  Approximately 15 seconds later the heavy set Hispanic male exited the residence and positioned

himself in front of 629 York Street.  The Hispanic male wearing the blue sweat jacket with white stripes was observed to converse with the heavy set Hispanic male for a short period of time and then walk across York Street and enter 628 York Street.

(Id. Ex. A.)  The remaining eleven paragraphs detail similar occurrences at 629 York Street, some of which were observed during continued surveillance on September 16 and 17.  In the affidavit, Detective Solis submits that he had "probable cause to believe that evidence in violation of NJS 2C:35-5, 2C:35-10 is located in or upon" 628 and 629 York Street.  He sought authorization to search those houses "for evidence including: CDS in pill, powder, crystal, liquid, or vegetation from [sic] and all objects/things used in connection with said substance."  (Id.) Based on Detective Solis's affidavit, The Honorable Samuel D. Natal, J.S.C. issued search warrants for both houses.

 The search warrants were executed on September 19, 2003.  The defendants other than Detective Solis are those members of "Troop A T.E.A.M.S." whose role it was to clear Trader's premises to ensure the safety of the investigative teams that followed them.  The T.E.A.M.S. procedure involves knocking firmly on the door and loudly announcing "State Police."  SFC Tully testified that he waits approximately thirty seconds after knocking before permitting the team to force the door open.  (Id. Ex. G at 25.)

Trader testified that she was in bed that morning when she heard a noise.  (Id. Ex. F at 14.)  She came downstairs and found her front door broken and the T.E.A.M.S. Officers in her home.  They told her they had a warrant to search the house for drugs, instructed her not to move, and repeatedly asked her where her son was.  (Id. at 14-16.)  Trader testified she was upset and was struggling to breathe.  (Id. at 20.)  T.E.A.M.S. Officers asked her to sit down in a chair, and

they called in a paramedic to attend to her.  (Id.)  When Trader had regained her composure somewhat, she explained there were no drugs in her home and she and her dog were the only residents.  (Id. at 14-15.)  Trader heard the officers searching upstairs, and she told them she had two guns stored upstairs.  (Id. at 20-21.)  After recovering the weapons, T.E.A.M.S. Officers placed Trader in restraints and transported her to a police station.  Trader was there for approximately two hours, during which time, she reviewed and signed an inventory of items the police had found in her house.  Eventually, the police escorted her back home.

During the sweep that included Trader's home, New Jersey State Police also arrested Angel Jiminez, owner of 629 York Street.  Jiminez told police Trader had nothing to do with the drug sales from her house and that when she was not at home, drug dealers purposely used her house to deflect attention from the actual source of their drug operation and because they did not like her since she frequently shooed them away.  (Id. Ex. E at 28.)  William Rosato, the Hispanic male whom Detective Solis identified as entering and exiting Traders house on September 11, was eventually charged with burglary based on statements by Detective Solis and Jiminez.  (Id. at 31.)

Trader filed the above-captioned suit on August 17, 2005, against Detective Solis, New Jersey Division of State Police, the City of Camden, and County of Camden, alleging violations of her Fourth, Fifth, and Fourteenth Amendment rights, negligence, and trespass.  Defendants filed a motion to dismiss or in the alternative for summary judgment on December 20, 2005, arguing Trader's claims are barred by sovereign immunity and by her failure to provide the requisite notice pursuant to the New Jersey Tort Claims Act.  In response, the Court dismissed the Division of State Police, the claims against Detective Solis in his official capacity, and the

claims of negligence and trespass.

On November 21, 2006, Trader sought leave to amend her complaint to add the T.E.A.M.S. Officers, which the Court granted.  After that, Trader dismissed her Fifth Amendment claim.  Finally, on October 1, 2007, Defendants moved for summary judgment on Trader's remaining claims.  Trader opposes the motion.

## II.    STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate where the Court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986).  A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could find for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  When the Court weighs the evidence presented by the parties, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."  Id. at 255.

The burden of establishing the nonexistence of a "genuine issue" is on the party moving for summary judgment.  Celotex, 477 U.S. at 330.  The moving party may satisfy this burden by either (1) submitting affirmative evidence that negates an essential element of the nonmoving party's claim; or (2) demonstrating to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's case.  Id. at 331.

Once the moving party satisfies this initial burden, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  To do so, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

9

Rather, to survive summary judgment, the nonmoving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

## III. DISCUSSION

Defendants base their motion for summary judgment on their assertion that they are entitled to qualified immunity on both of Trader's remaining claims. Trader disputes that contention, alleging Detective Solis fabricated certain evidence in the affidavit underlying the search warrant for her home. Specifically, Trader maintains it is not possible a drug dealer could have gained access to her home while she was away; therefore, Detective Solis must have misstated his observations of Rosado from September 11, 2003.

### A. Qualified Immunity Framework

Government officials who are accused of violating a person's constitutional rights while performing discretionary functions are entitled to qualified immunity. Qualified immunity shields officials "from liability from civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). This analysis is two-fold. First, the court is to assess whether the facts as adduced by the plaintiff amount to a constitutional violation. If this test is met, the court then determines whether the right is "clearly established." Saucier v. Katz, 533 U.S. 194, 200-01 (2001); Kopec v. Tate, 361 F.3d 772, 775-76 (3d Cir. 2004). In other words, before engaging in a determination of whether a right is clearly established, the court must first determine whether a constitutional violation has occurred, because "[i]f the plaintiff fails to make out a constitutional violation, the qualified immunity

10

inquiry is at an end; the [official] is entitled to immunity." Id. at 776 (quoting Bennett v. Murphy, 274 F.3d 133, 136 (3d Cir. 2002)).  As to the second prong of the qualified immunity analysis, the Supreme Court has determined that such a finding hinges on "whether it would be clear to a reasonable [official] that his conduct was unlawful in the situation he confronted." Saucier, 533 U.S. at 202.  Therefore, as an initial matter, the Court must address whether Trader sets forth constitutional violations.

> **B.   Fourth Amendment**

Trader alleges Defendants violated her Fourth Amendment rights when Detective Solis included false information in his affidavit and T.E.A.M.S. Officers searched her home without probable cause.  Defendants maintain Solis's affidavit is accurate and the warrant was validly issued and executed.

The Fourth Amendment provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.  Where a judge has issued a warrant, the supporting affidavit is entitled to a presumption of validity.  Franks v. Delaware, 438 U.S. 154, 171 (1978).  The party disputing the veracity of the warrant application can challenge the validity of the warrant by making a substantial preliminary showing that the affiant deliberately or recklessly included in the underlying affidavit falsehoods concerning material facts necessary to the determination of probable cause.  Id. at 155-56.  If the defendant establishes falsity by a preponderance of the evidence, the false statements will be stricken from the affidavit and the court will determine

whether the information remaining in the affidavit is sufficient to support a finding of probable

cause.  Id.  Although Franks was decided in the criminal context, the Third Circuit applies this

test to affidavits at issue in civil cases under § 1983.  Wilson v. Russo, 212 F.3d 781, 787 (2000).

Here, even construing the evidence in Trader's favor, she has failed to make the requisite

substantial showing that Detective Solis deliberately or recklessly included false information in

his affidavit.  Trader testified she was out of town on September 11, 2003, but that it would have

been impossible for anyone to enter her house to sell drugs on that date.  (See Defs.' Br. Exs. A

at 56; I ¶ 27.)  She attests that her house was secure while she was away, because her doors were

deadbolted, only trusted family members have keys, and she always locks her windows when she

leaves home.  (Id. Ex. A at 10-12.)

While Trader's testimony provides circumstantial evidence that no one accessed her

house on September 11, 2003, it is not enough to show by a preponderance of the evidence that

Detective Solis's observations of Rosato entering and exiting Trader's front door on that date

were fabricated.  In Detective Solis's affidavit, he describes in detail the movements of each

individual he observed on that date.  Those observations include Rosato "enter[ing] the residence

of 628 York Street through the front door and remain[ing] inside for approximately 20 seconds"

and "reach[ing] inside of the window located to the left of the front door."  Detective Solis could

not tell whether Rosato used a key to gain access to Trader's house; however, his affidavit

accounts for other specifics like the door's brass deadbolt, the location of the knob, and the

direction the door swings.  (Id.)  Moreover, the state subsequently charged Rosato with burglary

of Trader's residence based on Detective Solis's observations and Jiminez's statement.

Assuming arguendo that Trader could make a substantial preliminary showing of

falsehood, she still could not ultimately prevail under the <u>Franks</u> analysis.  Even stricken of the facts involving Rosato's entry and exit from the front door and his reaching through Trader's windows, the affidavit would still have supported a probable cause determination.  The Third Circuit has repeatedly found that "direct evidence linking the crime to the location to be searched is not required to support a search warrant."  <u>United States v. Whitner</u>, 219 F.3d 289, 297 (3d Cir. 2000).  Rather, "probable cause can be, and often is, inferred by 'considering the type of crime, the nature of the items sought, the suspect's opportunity for concealment and normal inferences about where a criminal might hide'" contraband.  <u>United States v. Jones</u>, 994 F.2d 1051, 1056 (3d Cir. 1993) (quoting <u>United States v. Jackson</u>, 756 F.2d 703, 705 (9th Cir. 1985)).  "The issuing judge or magistrate may give considerable weight to the conclusions of experienced law enforcement officers regarding where evidence of a crime is likely to be found and is entitled to draw reasonable inferences about where evidence is likely to be kept, based on the nature of the evidence and the type of offense."  <u>Whitner</u>, 219 F.3d at 296 (quoting <u>United States v. Caicedo</u>, 85 F.3d 1184, 1192 (6th Cir. 1996)).  In addition, "[p]roperty owned by a person absolutely innocent of any wrongdoing may nevertheless be searched under a valid warrant."  <u>United States v. Tehfe</u>, 722 F.2d 1114, 1117-18 (3d Cir. 1983) (citing <u>Zurcher v. Stanford Daily</u>, 436 U.S. 547, 553-560 (1978)).

In this instance, a confidential informant, who had provided Detective Solis with reliable information in the past, told him that a Hispanic man, known as "Dirty Danny," was selling heroin from Trader's home and from the house across the street.  The informant stated that heroin is delivered to Trader's address by another Hispanic man in a blue Chevrolet Suburban.  When Detective Solis later conducted surveillance of 628 York Street, he observed Rosato arrive at

Trader's home in a Blue Chevrolet Suburban.  In twenty minutes, Detective Solis witnessed six individuals arrive on Trader's property, speak briefly with Rosato, exchange money for small items, and then depart.  Based on his extensive law enforcement experience, Detective Solis believed these events to be drug sales.  The first buyer Detective Solis witnessed that day was arrested once he left the vicinity, and police confirmed that the items purchased were in fact bags of heroin.

Assuming Rosato never actually entered Trader's home, but merely sold the drugs from her front porch, a judge could have reasonably inferred that the interior of the house contained contraband or evidence of crime.  Observing an individual conduct drug sales from the front porch of a house warrants the common sense inference that there exists a fair probability that the house contains fruits of a crime.  See Illinois v. Gates, 462 U.S. 213, 238 (1983) (stating magistrate must "make a practical commonsense decision whether, given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place"); United States v. Harris, 118 F. App'x 592, 593-94 (3d Cir. 2004) (upholding validity of warrant to search house based on officers' observations of numerous people visiting residence for short periods of time and bags of trash removed from curbside of house that contained cocaine residue).

As a result, Trader has not set forth a Fourth Amendment violation.  She fails to meet her burden under Franks and even absent the evidence of a suspected drug dealer entering and exiting her home, the affidavit still would have offered Judge Natal ample evidence of probable cause.  Therefore, the search of her home did not contravene the Fourth Amendment's prohibition of unreasonable searches.  Because Trader fails to make out a claim under the Fourth

14

Amendment, Defendants merit qualified immunity on Trader's Fourth Amendment claim.

### C.     Fourteenth Amendment

Trader maintains that Defendants deprived her of her Fourteenth Amendment rights to life and liberty when they forcibly entered her residence without probable cause, "causing [her] injury to her physical and mental well-being."  Defendants again argue Trader has not established a constitutional violation and thus they merit qualified immunity.

The Third Circuit has held that to establish a violation of substantive due process rights, the action alleged must be "so ill-conceived or malicious that it shocks the conscience."  Miller v. City of Phila., 174 F.3d 368, 375 (3d Cir. 1999) (quoting County of Sacramento v. Lewis, 523 U.S. 833, 846 (1998)).  Mere negligence is not sufficient to meet this standard.  Lewis, 523 U.S. at 847.  The standard often used by the Supreme Court to determine whether an action has reached that level is the "deliberate indifference" standard.  Id. at 851.  The Third Circuit acknowledged that the meaning of this "shocks the conscience" standard varies depending on the factual context of the case.  Miller, 174 F.3d at 375; see also United Artists Theatre Circuit, Inc. v. Twp. of Warrington, 316 F.3d 392, 399-400 (3d Cir. 2003); Nicini v. Morra, 212 F.3d 798, 810 (3d Cir. 2000) ("A plaintiff seeking to establish a constitutional violation must demonstrate that the official's conduct 'shocks the conscience' in the particular setting in which that conduct occurred").

Typically, the "conscience shocking" standard provides relief for physical abuse.  See Rochin v. California, 342 U.S. 165 (1952) (due process violated when evidence obtained by subjecting the suspect to an involuntary stomach pump).  Some courts have suggested that "conscience shocking" behavior must be either physically intrusive or violent, or strike at the

basic fabric of a protected relationship, such as a parent-child relationship.  See Cruz-Erazo v. Rivera-Montanez, 212 F.3d 617, 623 (1st Cir. 2000).

In this case, the Court does not diminish the alarm and upset Trader no doubt felt at discovering state police had forced their way into her home and planned to search it for drugs. Nevertheless, the Court cannot find that Defendants' conduct gives rise to a violation of Trader's rights under the Fourteenth Amendment.  Defendants acted pursuant to a valid search warrant. Trader testified that T.E.A.M.S. Officers sat her in a chair during their sweep of her home.  She stated they did not use obscene language towards her or point a gun at her.  Moreover, besides the tightness in her chest and her shortness of breath caused by her distress at their presence, there is no evidence any T.E.A.M.S. Officers caused Trader physical harm.  They were in her home for approximately fifteen minutes, during which they called for a paramedic to ensure Trader's health was not in jeopardy.  As such, Defendants did not engage in anything approaching conscience-shocking behavior.  Since there is no constitutional violation, Defendants are entitled to qualified immunity on Trader's Fourteenth Amendment claim.

## IV.    CONCLUSION

Based on the foregoing reasoning, the Court will grant Defendants' motion for summary judgment.  An accompanying order shall issue today.


Dated: 6-13-08                                            s/ Robert B. Kugler
                                                         ROBERT B. KUGLER
                                                         United States District Judge